## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

### CASE NO.: 1:22-cv-01078-RP

BETTY'S BEST, INC,

        Plaintiff,

v.

YUYAO AGGPO ELECTRONIC
TECHNOLOGY CO., LTD., et al.,

        Defendants.

_____

### PLAINTIFF'S *EX PARTE* APPLICATION FOR ENTRY OF TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND ORDER RESTRAINING TRANSFER OF ASSETS AND INCORPORATED MEMORANDUM OF LAW

Plaintiff Betty's Best, Inc. ("Betty's Best" or "Plaintiff") by and through its undersigned counsel, hereby moves this Honorable Court for Temporary Restraining Order and an order restraining transfer of assets, and upon expiration of the Temporary Restraining Order, a preliminary injunction against Defendants, the individuals, partnerships, and unincorporated associations identified on Schedule "A" to the Complaint in this action ("Defendants") pursuant to 15 U.S.C. § 1116, Fed. R. Civ. P. 65, 17 U.S.C §§ 502 and 503, 35 U.S.C. §§281 and 283, and The All Writs Act, 28 U.S.C. § 1651(a), and in support thereof states as follows:

### I.      INTRODUCTION

Defendants are knowingly and intentionally promoting, advertising, distributing, offering for sale, and selling goods bearing counterfeits and confusingly similar imitations of one or more of Plaintiff's registered trademarks, copyrights and design patent within this district and throughout the United States by operating e-commerce stores established via third party

marketplace platforms under their seller identification names identified on Schedule "A" to the Complaint (the "Seller IDs").

Specifically, Plaintiff has obtained evidence clearly demonstrating that: (a) Defendants are engaged in the advertisement, offering for sale, and sale of counterfeit and infringing versions of Plaintiff's goods; and (b) Defendants accomplish their sales of counterfeit and infringing goods via the Internet through the use of, at least, e-commerce stores operated via Internet marketplace platforms under the Seller IDs.

Based on this evidence, Plaintiff's Complaint alleges claims for trademark counterfeiting and infringement, false designation of origin, common law unfair competition, and common law trademark infringement, and copyrights and patent infringements.

Defendants' unlawful activities have deprived and continue to deprive Plaintiff of its right to determine the manner in which its trademarks, copyrights and design patent are presented to the public. Defendants have and continue to wrongfully trade and capitalize on Plaintiff's reputation and goodwill and the commercial value of Plaintiff's trademarks, copyrights and design patent. By their activities, Defendants are defrauding Plaintiff, certain non-party businesses, and the consuming public for their own benefit.

Defendants should not be permitted to continue their unlawful activities, which are causing Plaintiff ongoing irreparable harm. Accordingly, Plaintiff is seeking entry of a Temporary Restraining Order prohibiting Defendants' further wrongful use of Plaintiff's trademarks, copyrights and design patent. Plaintiff also seeks to restrain the illegal profits generated by Defendants.

Plaintiff has obtained evidence that Defendants operating their Seller IDs via Alibaba.com, AliExpress.com, Amazon.com, eBay.com, Joom.com, Newegg.com,

Walmart.com, Wish.com, and others. All these seller platforms process payments or have related companies that perform payment processing for them.

The Lanham Act allows Plaintiff to recover the illegal profits gained through Defendants' distribution and sales of counterfeit and infringing goods. See 15 U.S.C. § 1117(a). The Copyrights Act allows Plaintiff to recover, as an equitable remedy, the actual damages suffered as result of the infringement and any additional profits of the Defendants that are attributable to the infringement and are not taken into account in computing the actual damages (17 U.S.C § 504(b)) or statutory damages (17 U.S.C § 504(c)). )). The Patent Act allows Plaintiff to be compensated for the infringement, no less that a reasonable royalty for the use made of the invention by the Defendants, together with the interest and cost fixed by the Court. (See 35 U.S.C. § 284). Also, Plaintiff is entitled to the extent of the total profit obtained by the Defendants for applying its registered design patent or any colorable imitation thereof, to Defendant's products for purpose of sale or expose for sale. (See 35 U.S.C. § 289).

In light of the inherently deceptive nature of the counterfeiting business, Plaintiff has good reason to believe Defendants will hide or transfer their ill-gotten assets beyond the jurisdiction of this Court unless they are restrained. Accordingly, to preserve the disgorgement remedy, Plaintiff seeks an *ex parte* order restraining Defendants' assets, including specifically, funds transmitted through payment processors for the platforms on which Defendants engage in their illegal activities.

## II.      STATEMENT OF FACTS

### A.      Background On Betty's Best, Inc.

1.      Betty's Best is a California Corporation with its principal place of business in Santa Ynez, California. The President and Chief Executive Officer of Betty's Best is Sarah M.

Owen. (Owen Decl. ¶¶ 4, 5). Betty's Best incorporated on January 1, 2016 and has been in continuous operation since then. (Owen Decl. ¶ 6).

2.     Betty's Best is the maker of the StripHair Gentle Groomer, a therapeutic brush for horses and dogs. (Owen Decl. ¶ 7). Betty's Best owns the trademarks, copyrights and design patent described below that are the subject of this action in United States. (Owen Decl. ¶ 9). designs and sells its StripHair Gentle Groomer under the federally registered trademarks STRIPHAIR and THE GENTLE GROOMER. (Owen Decl. ¶ 10).

3.     Betty's Best's products are sold through hundreds of authorized retailers in the United States and many countries like United Kingdom and Australia, listed on the StripHair.com Store Locator Map at https://striphair.com/pages/retail-store-locator, its own website https://striphair.com/collections/all-products, Amazon and other authorized retailers. (Owen Decl. ¶ 8). Betty's Best offers for sale and sells its products within the state of Texas, including this district, and throughout the United States. (Owen Decl. ¶ 11). Online sales of Betty's Best Marks products via the web represent a significant portion of Plaintiff's business. (Owen Decl. ¶ 25).

4.     Like other intellectual property rights owners, Betty's Best suffers ongoing violations of its rights by counterfeiters and infringers, such as Defendants herein. (Owen Decl. ¶ 12). This harms Betty's Best, it dupes the consuming public, and the Defendants earn substantial profits. (Owen Decl. ¶ 13).

5.     To combat the harm caused by Defendants' infringing conduct, Betty's Best spends money on legal fees and investigative fees to enforce its intellectual property rights. (Owen Decl. ¶ 14). The explosion of internet infringement forced Betty's Best to spend time and

money to protect itself and its customers from the confusion and brand erosion. (Owen Decl. ¶ 15).

**B.     Betty's Best's Trademark Rights**

6.      Plaintiff created and sells unique patented grooming tools under the federally registered trademarks STRIPHAIR and THE GENTLE GROOMER (collectively the "Betty's Best Marks"), the first multi-purpose grooming tools of their kind, known as the "6-in-1 Shedding Grooming Massage brush" for horses and pets that can be used in 6 ways to shed, groom, shine, shampoo, scrape and massage. The StripHair Gentle Groomer is ideal for short-haired animals because it will not harm the skin, but it will also shed out a thick hairy coat in the spring-time molting season while providing a therapeutic massage and adding shine to the coat. It's safe to use everywhere, even the face and legs. The material used to make the StripHair Gentle Groomer is perfectly balanced to achieve outstanding durability, flexibility, cleanliness, sun protection, and just the perfect amount of grip. (Owen Decl. ¶ 16).

7.      Betty's Best is the owner of all rights in and to the Betty's Best Marks in Standard Characters, namely, 5072866 STRIPHAIR (first used on October 01, 2014, and first used in commerce on December 16, 2014) and 5328641 THE GENTLE GROOMER (first used and first used in commerce on 2015) for "grooming tools for pets, namely, combs and brushes; Currycombs" in International Class 21. The Betty's Best Marks are valid and registered on the Principal Register of the United States Patent and Trademark Office. The STRIPHAIR Mark is incontestable. (Owen Decl. ¶¶ 17-19).

8.      The Betty's Best Marks identifies and distinguishes Plaintiff's high-quality and unique patented grooming tools. (Owen Decl. ¶ 21).

9.      The Betty's Best Marks are exclusive to Betty's Best and are displayed extensively on Plaintiff's products and in our marketing and promotional materials. (Owen Decl. ¶ 26). Betty's Best products have been extensively promoted and advertised at great expense to Betty's Best. (Owen Decl. ¶ 27). Betty's Best Marks are distinctive and signifies to the purchaser that the products come from Betty's Best and are manufactured to its quality standards. The authentic products are all made in United States. (Owen Decl. ¶ 28).

10.     The goodwill associated with the Betty's Best Marks is of incalculable and inestimable value. (Owen Decl. ¶ 30). Betty's Best has expended substantial time, money, and other resources developing, advertising, and otherwise promoting the Betty's Best Marks in connection with Betty's Best's products. Betty's Best's average marketing and promotional investments are over $225,000 per year. (Owen Decl. ¶ 31). Product sales using the Betty's Best Marks generated $1.6M (USD) in 2021, and, as a result, the consuming public readily identifies the Betty's Best Marks as representing high-quality and unique goods sponsored and approved by Plaintiff. (Owen Decl. ¶¶ 34, 35).

11.     Plaintiff monitors and polices the Betty's Best Marks carefully. (Owen Decl. ¶ 37). Genuine goods with the Betty's Best Marks are advertised and promoted by Plaintiff, authorized distributors, and third parties on the Internet. (Owen Decl. ¶ 38).Visibility on the Internet, including in search engines like Google, Yahoo!, and Bing, is important to Plaintiff's marketing efforts. (Owen Decl. ¶ 39). Plaintiff invests in internet marketing and consumer education, including search engine optimization ["SEO"] strategies, that educate consumers about the value of Plaintiff's products and the Betty's Best Marks (Owen Decl. ¶¶ 40, 41).

C.     **Betty's Best's Copyright Rights**

12.     Plaintiff advertises, markets, promotes and sells its products under the Betty's Best Marks using photographs and through a website that are protected by copyright and registered with the Copyright Office (collectively the "Works"). Plaintiff's photographs are duly registered with the Register of Copyrights as visual materials, namely, VA 2-300-902 StripHair Product Pictures 2019 (group of 7 photographs) registered on May 19, 2022, and VA 2-299-367 StripHair Product Pictures 2020 (group of 10 photographs) registered on May 12, 2022 (Owen Decl. ¶¶ 42, 43). Plaintiff's website content comprising photographs and text, titled "striphair.com website" is duly registered with the Register of Copyrights under the Reg. No. VA 2-271-013, effective from October 6, 2021. (Owen Decl. ¶ 44).

13.     The copyrighted photographs and the website content show Betty's Best's high-quality and unique patented grooming tools design features, its packaging, and its effective use from different perspectives in horses and pets. (Owen Decl. ¶ 45). Genuine grooming tools bearing or sold under the Betty's Best Marks are widely legitimately advertised and promoted by Betty's Best and its authorized distributors using Betty's Best's copyrighted photographs and through its website content. (Owen Decl. ¶ 46).

14.     Betty's Best has never granted authorization to anyone to advertise, market or promote unauthorized goods using Betty's Best's copyrighted photographs and its website content. (Owen Decl. ¶ 47).

D.     **Betty's Best's Patent Rights**

15.     Plaintiff's grooming tools' design features are protected under a design patent and registered with the United Stated Patent and Trademark Office under the U.S. Patent No. D841,900 S titled "HORSE OR PET GROOMING TOOL" (the "HOPGT Design Patent").

(Owen Decl. ¶ 48). The HOPGT Design Patent was registered on February 26, 2019, has not expired and is valid. (Owen Decl. ¶ 50).

16.    The HOPGT Design Patent relates to the ornamental design for a horse or pet grooming tool as shown and described through four figures corresponding and ordering in front, top, bottom and side views, in which the rear view of the design is identical to the front view and both side views are identical each other. (Owen Decl. ¶ 49).

17.    Plaintiff marked its products with a Patent Notice (Owen Decl. ¶ 51). Plaintiff has never granted authorization to anyone to import, make, use or sell unauthorized goods using the HOPGT Design Patent. (Owen Decl. ¶ 52).

**E.    Defendants' Counterfeiting and Infringing Activites**

18.    The success of Plaintiff's products resulted in counterfeiting by individuals and entities unlawfully using the trademarks, copyrights, design patent and goodwill built by Betty's Best to sell cheap imitation counterfeits of Betty's Best's products. (Owen Decl. ¶ 53). The Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent were never assigned or licensed to any of the Defendants. (Owen Decl. ¶ 62). Despite Defendants' lack of authority, they are promoting, advertising, distributing, selling and/or offering for sale, through their respective Seller IDs, goods bearing counterfeit and infringing copies of the Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent, without authorization ("Defendants' Goods"). (Owen Decl. ¶ 70;  Rothman Decl. ¶¶ 10, 11).

19.    Plaintiff's anticounterfeiting program investigates suspicious websites and online marketplace listings identified in proactive Internet sweeps and reported by consumers. (Owen Decl. ¶ 54). Plaintiff investigated the promotion and sale of counterfeit and infringing products by Defendants to obtain payment account information for funds paid to Defendants for the sale

of counterfeit products. (Owen Decl. ¶ 55). These investigations established that Defendants use Alibaba.com, AliExpress.com, Amazon.com, eBay.com, Joom.com, Newegg.com, Walmart.com, Wish.com, and others to sell Counterfeit Products from foreign countries such as China to consumers in the United States. (Owen Decl. ¶ 56). Betty's Best or someone under its supervision accessed Defendants' Internet based e-commerce stores operating under their seller identification names through Alibaba.com, AliExpress.com, Amazon.com, eBay.com, Joom.com, Newegg.com, Walmart.com, Wish.com, and others. (Owen Decl. ¶ 57). Betty's Best or someone under its supervision viewed counterfeit products using the Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent, added products to the online shopping cart, proceeded to a point of checkout, and exchanged data with each e-commerce store. (Owen Decl. ¶ 59, Composite Ex. 1). Betty's Best placed test orders from certain Defendants via their e-commerce stores operating under the Seller IDs for the purchase of various products all bearing counterfeits and infringements of Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent (Owen Decl. ¶ 73).

20.    Betty's Best's orders were processed entirely online and following the submission of the orders, Betty's Best received information to finalize payment for each of the products ordered via a payment processor for Alibaba.com, AliExpress.com, Amazon.com, eBay.com, Joom.com, Newegg.com, Walmart.com, Wish.com, and others. (Owen Decl. ¶ 74). Betty's Best or someone under its supervision captured detailed web pages for each Defendant reflecting each counterfeit or infringing product bearing counterfeits and infringements of Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent. (Owen Decl. ¶ 60, Composite Ex. 1). These web pages show Defendants slavishly copy the Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent and offer Defendants' Goods for sale under identical

9

marks indistinguishable to consumers, both at the point of sale and post-sale. (Owen Decl. ¶ 66, Composite Ex. 1). Defendants created a false association between their counterfeit and infringing goods, their e-commerce stores, and Plaintiff, and this false association causes Plaintiff irreparable harm and damage. Defendant's counterfeit grooming tools reproduce the main design features of the HOPGT Design Patent, as is shown in two Claim Charts attached hereto as Exhibit 5 to the Complaint. (Owen Decl. ¶ 68).

21.     Betty's Best's or someone under their supervision personally analyzed each of the Infringing Websites and determined that Counterfeit Products were being offered for sale to residents of the United States. (Owen Decl. ¶ 65, Composite Ex. 1). Plaintiff or someone under their supervision reviewed and visually inspected the detailed web page captures and photographs reflecting the Plaintiff branded products and determined the products were not genuine versions of Plaintiff's goods. *(Id.)*

### F.     Counterfeiting on Social Media

22.     Plaintiff has found counterfeiting in advertising on social media that links to sellers on online marketplaces, which introduce an additional variation to the counterfeiting occurring directly on online marketplaces like Amazon.com. Since 2021, Plaintiff has searched out, observed, and recorded this new practice engaged in by counterfeiters. Counterfeiters are using sophisticated advertising practices and tools to generate multiple ad versions using Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent to imitate the StripHair brand and deceive the consumer to purchase counterfeit products from ad-linked website pages. (Owen Decl. ¶¶ 78, 79).

23.     Counterfeit sellers use software to alter Betty's Best photographs in creating paid sponsored advertisements within a Facebook account having ad links directly to associated

website pages with active shopping buttons revealing more uses of Betty's Best Marks, the copyrighted Works and the HOPGT Design Patent. For the past eleven months, Plaintiff have searched many of the Facebook Ads, made publicly available in the online Ads Library, for specific terms that are common to Betty's Best and used also by counterfeiters. The Plaintiff in this case documented this activity and it is set forth in Schedule B to the Complaint. To date, Plaintiff has submitted over 2,210 IP Infringement Reports to Facebook, without resulting in any action to stop Facebook Ad buyers from using Facebook Ads to promote the sale of counterfeit Betty's Best products. (Owen Decl. ¶¶ 80, 81).

24.     All of the Facebook pages and Facebook Ads are owned, operated or administered by Defendants identified on Schedule "A" to the Complaint who are located in China and are using and abusing Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent to sell counterfeit products. Plaintiff will be unable to stop the counterfeiting of its Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent unless the Court includes Facebook (and its parent company Meta) in its Temporary Restraining Order and requires Facebook to abide by U.S. law, prevent further abuse of the Betty's Best's intellectual property rights, and abide by its own Brand Rights Protection policy. (Owen Decl. ¶¶ 82, 83)

**G.     The Irreparable Harm to Plaintiff in the Form of Price Erosion, Damage to Reputation, and Loss of Goodwill Not Compensable by Damages Alone**

25.     Defendants are selling their infringing goods to consumers within this district and throughout the United States. (Owen Decl. ¶¶ 56, 67, 70, 74, 75-77, 82; Rothman Decl. ¶ 8). Defendants make substantial sums of money preying on members of the public, many of whom have no knowledge Defendants are defrauding them. (Owen Decl. ¶ 13). Defendants are responsible for thousands of counterfeit products sold using the Betty's Best Marks, the

copyrighted Works, and the HOPGT Design Patent. (Owen Decl. ¶ 71). Each sale results in a direct loss to Betty's Best. (Owen Decl. ¶ 72).

26.     Defendants falsely represent that their counterfeit and infringing goods are genuine, authentic, endorsed, and authorized by Plaintiff. (Owen Decl. ¶ 69). Defendants' internet activities infringe on Plaintiff's intellectual property rights. (Owen Decl. ¶¶ 56, 59, 60) The Seller IDs and associated payment accounts are a substantial part of the means by which Defendants further their scheme and cause harm to Plaintiff. (Owen Decl. ¶ 58).

27.     As the illegal marketplace for Betty's Best's products grows on the Internet, the legitimate marketplace for authentic Betty's Best's products shrinks. (Owen Decl. ¶ 84). Monetary damages cannot adequately compensate Betty's Best for ongoing infringement because monetary damages fail to address the loss of control and damage to Betty's Best's reputation and goodwill. (Owen Decl. ¶ 85). Furthermore, monetary damages are difficult, if not impossible, to ascertain due to the inability to calculate measurable damage in dollars and cents caused to our reputation and goodwill by acts of infringement. (Owen Decl. ¶ 86).

28.     Betty's Best's goodwill and reputation are irreparably damaged when the Betty's Best Marks are used on goods not authorized, produced or manufactured by Plaintiff. (Owen Decl. ¶ 87). Moreover, brand confidence is damaged, which can result in loss of future sales and market share. (Owen Decl. ¶ 88). The harm to Betty's Best's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable. (Owen Decl. ¶ 89). Betty's Best is further irreparably harmed because counterfeiters take away Betty's Best's ability to control the nature and quality of Counterfeit Products. (Owen Decl. ¶ 90).

29.     Loss of quality control over goods bearing or sold under the Betty's Best Marks and, in turn, loss of control over our reputation, is neither calculable nor precisely compensable. (Owen Decl. ¶ 91). The sale of counterfeit and infringing products bearing or sold under the Betty's Best Marks causes consumer confusion that weakens the Betty's Best Marks' brand recognition and reputation. (Owen Decl. ¶ 92). Mistake and confusion will cause consumers to believe Plaintiff offers low quality products; confused consumers who buy inferior quality infringing products thinking they are genuine undermines Plaintiff's reputation and goodwill.[1] (Owen Decl. ¶¶ 93, 94).

30.     Betty's Best is further irreparably damaged due to a loss of exclusivity. Betty's Best's extensive marketing and innovative patented designs are aimed at growing and sustaining sales. When counterfeiters use the Betty's Best Marks on goods without authorization, the exclusivity of the Betty's Best's products, as well as Betty's Best's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales. (Owen Decl. ¶ 96).

### III.     ARGUMENT

### A.     A Temporary Restraining Order is Essential to Prevent Immediate Injury

A temporary restraining order may be granted without written or oral notice where "specific facts in an affidavit . . . clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b). Entry of a TRO is warranted here. Plaintiff has shown that Defendants fraudulently promote, advertise, sell, and offer for sale goods bearing counterfeits and infringements of the Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent, via their e-

---

[1] Even if a consumer knows she is buying counterfeit goods, prospective consumers who see those goods used by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of Betty's Best's products. Such post-sale confusion results in further damage Betty's Best's reputation and correlates to a loss of unquantifiable future sales. (Owen Decl. ¶ 95).

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

commerce stores using the Seller IDs, and are creating a false association in the minds of consumers between Defendants and Plaintiff. Plaintiff has shown Defendants are wrongfully using counterfeits and infringements of the Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent to increase consumer traffic to their illegal operations.

The entry of a Temporary Restraining Order would immediately stop Defendants and preserve the *status quo* until such time as a hearing can be held[2]. Absent a TRO, Defendants can and, based upon Plaintiff's counsel's past experience, will significantly alter the *status quo* before the Court can determine the parties' respective rights. The internet e-commerce stores are under Defendants' complete control, and Defendants can change ownership or e-commerce store data and content, redirect consumer traffic, change payment accounts, and transfer assets and ownership of the Seller IDs at a moment's notice. (Rothman Decl. ¶¶ 14, 15). Defendants can easily and quickly transfer and secret the funds sought to be restrained and thereby thwart the Court's ability to grant meaningful relief. *(Id.)*

Defendants engage in illegal counterfeiting and infringing activities. Defendants' assets will be unavailable for recovery or an accounting of profits without the entry of an *ex parte* TRO. The business of counterfeiters is built on deliberate misappropriation of rights and property belonging to others. Proceeding on an *ex parte* basis is a well-established practice.[3]

---

[2] See *Rio Bravo Produce, Ltd. v. Superior Tomato-Avocado, Ltd., Inc.*, No. CIV.A. SA-11-CA-1126, 2011 WL 6938450, at *3 (W.D. Tex. Dec. 30, 2011) (finding *ex parte* relief appropriate because of a substantial likelihood that absent injunctive relief, Defendant's assets would be dissipated making recovery unlikely for the Plaintiff).
[3] See Brainstorm CC, LLC v. Doe 1, No. 4:20-CV-554, 2020 WL 8267578, at *8 (E.D. Tex. July 21, 2020) (granting Plaintiff's ex parte Motion for a Temporary Restraining Order and Expedited Discovery); Chanel, Inc. v. P'ship & Unincorporated Ass'n Identified in Schedule A, No. CIV.A. H-12-2085, 2012 WL 3527147, at *2 (S.D. Tex. Aug. 14, 2012) (granting Plaintiff's ex parte Application for Entry of a Temporary Restraining Order).

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

**B.      Standard for Temporary Restraining Order and Preliminary Injunction.**

To obtain a TRO or a preliminary injunction[4], a party must establish (1) a substantial

likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not

granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-

movant; and (4) that entry of the relief would not disserve the public interest.[5] Plaintiff's

evidence establishes all of the relevant factors.

**1.      Probability of Success on the Merits of Plaintiff's Claims.**

**a)      Likelihood of Success on Counterfeiting Claim.**

Liability for trademark infringement is established where, without the consent of the

registrant, a Defendant uses "in commerce any reproduction, counterfeit, copy, or colorable

imitation of a registered mark in connection with the sale, offering for sale, distribution, or

advertising of any goods or services on or in connection with which such use is likely to cause

confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114. Plaintiff must demonstrate (1)

ownership of the trademarks at issue; (2) Defendants' use of the trademarks is without Plaintiff's

authorization; and (3) Defendants' use is likely to cause confusion, mistake, or deception as to

the source, affiliation, or sponsorship of Defendants' Goods. See 15 U.S.C. § 1114(1). Plaintiff's

evidence satisfies these requirements of 15 U.S.C. § 1114.

The Betty's Best Marks are owned by Plaintiff and registered on the Principal Register of

the United States Trademark Office. (Owen Decl. ¶¶ 17, 18). Defendants have never had the

right or authority to use the Betty's Best Marks. (Owen Decl. ¶¶ 38, 62). The first two elements

have been met.

---

[4] The standard for obtaining a temporary restraining order and the standard for obtaining a preliminary injunction are
the same. See *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 818 (W.D. Tex. 2017) (citing *Jackson
Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014)).

[5] *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003); see also *Janvey v. Alguire*, 647
F.3d 585, 603 (5th Cir. 2011) (affirming entry of preliminary injunction and freezing of assets).

Likelihood of confusion, the third factor, is established by an evaluation of eight "digits of confusion."[6] These digits are: (1) the type of mark infringed, (2) the similarity between the marks, (3) the similarity of the products, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the Defendant's intent, (7) evidence of actual confusion, and (8) the degree of care exercised by potential purchasers.[7]

Among the eight digits of confusion, two possess particular prominence: bad intent and actual confusion.[8] Bad intent (the sixth digit) may alone be sufficient to justify an inference that there is a likelihood of confusion.[9] And actual confusion (the seventh digit) "constitutes the best evidence of a likelihood of confusion."[10]

However, "no single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors."[11] The eight-digit analysis "may weigh differently from case to case, depending on the particular facts and circumstances involved."[12]

1)  Type of Mark Infringed

In assessing the type of mark in an infringement claim, the court must determine the mark's strength.  "The stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark."[13] The strength of a mark is determined by two factors. First, it is measured by the distinctiveness of the type of mark.[14] Trademarks are divided into

[6] See *Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008).
[7] *Future Proof Brands, L.L.C. v. Molson Coors Bev. Co.*, 982 F.3d 280, 289 (5th Cir. 2020); see also *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 218 (5th Cir.1985).
[8] *Future Proof Brands*, 982 F.3d at 289.
[9] *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 455 (5th Cir. 2017).
[10] *Future Proof Brands*, 982 F.3d at 289.
[11] *Streamline Prod. Sys.,* 851 F.3d at 446.
[12] *Id*.
[13] *Bd. of Supervisors*, 550 F.3d at 479.
[14] *Am. Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321, 330 (5th Cir. 2008).

four types: (1) coined, fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic.[15] The strength of a mark "increases as one moves away from generic and descriptive marks toward arbitrary marks."[16]

The second factor determining the strength of a mark is the degree to which it is recognized in the marketplace.[17] "Marketplace recognition depends on advertising, length of time in business, public recognition, and uniqueness."[18] Overall, "[i]nherent distinctiveness is attributable to a mark when the mark almost automatically tells a customer that it refers to a brand and immediately signals a brand or a product source."[19]

The Betty's Best Marks are a strong marks. (Owen Decl. ¶ 19, 20, 23, 26-28, 30-36). The Betty's Best Marks have also acquired secondary meaning resulting from Plaintiff's extensive efforts and expense developing, advertising, and promoting the Betty's Best Marks. *(Id.).* As a result, the Betty's Best Marks enjoys widespread recognition in the minds of consumers. *(Id.)*

### 2)  Similarity Between the Marks

When determining the similarity between the marks, the court must compare the marks' appearance, sound, and meaning.[20] Though a consumer may "recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users."[21] Thus, "the relevant inquiry is whether … the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated."[22]

---

[15] See *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).
[16] *Am. Rice, Inc.*, 518 F.3d at 330.
[17] *Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 814 (5th Cir. 2019), as revised (Jan. 29, 2019), as revised (Feb. 14, 2019).
[18] *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 698 (S.D. Tex. 2009).
[19] *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 230 (5th Cir. 2010).
[20] *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 193 (5th Cir. 2018).
[21] *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 191 (5th Cir. 1998).
[22] *Id.*

Defendants are using one or more of the Betty's Best Marks (Compare Trademarks Registrations, Complaint Composite Ex. 1 to Defendants' Seller IDs and screen captures in Owen Decl. Composite Ex.1).

      3)  Similarity of the Products.

Similarity of the products or services is a proximity analysis. "The more similar the products and services, the greater the likelihood of confusion."[23] Further, relatedness in distribution and use helps determine the similarity of the products for purposes of consumer confusion and trademark infringement.[24]

Defendants are selling the same types of goods Plaintiff sells. (Owen Decl. ¶¶ 59, 60, 78-81, 98, 99; Composite Ex. 1). Because they bear counterfeits of the Betty's Best Marks, Defendants' Goods appear virtually identical to Plaintiff's genuine products in the consumer market.

      4)  Identity of the Retail Outlets and Purchasers

Courts will evaluate whether the genuine goods and counterfeit goods share the same or similar retail outlets and purchasers.[25] "The greater the overlap between retail outlets and purchasers, the greater the likelihood of confusion."[26]

Both Plaintiff and Defendants sell their products using at least one of the same marketing channels, the Internet, in the same geographical distribution areas within the United States, including the Southern District of Texas. (Owen Decl. ¶¶ 8, 11, 25, 56, 67, 70, 74, 75, 76). The sales channels overlap. The consumers are the same.

---

[23] *Viacom Int'l*, 891 F.3d at 182.

[24] See *Bell v. Starbucks U.S. Brands Corp.*, 389 F. Supp. 2d 766, 768 (S.D. Tex. 2005).

[25] See *Future Proof Brands, LLC v. Molson Coors Beverage Co.*, No. A-20-CV-00144-JRN, 2020 WL 3578327, at *4 (W.D. Tex. Mar. 24, 2020), *aff'd sub nom. Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280 (5th Cir. 2020).

[26] *Viacom Int'l*, 891 F.3d at 194.

5)  Identity of the Advertising Media Used

To determine the identity of advertising media used in an infringement claim, courts look to various sources of commercial speech, "including at the venues where the products are sold and through the use of internet keywords."[27]

This factor looks to each party's method of advertising.[28] "[T]he standard is whether there is likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result."[29]

Here both parties advertise online. (Owen Decl. ¶¶ 26, 32, 36, 38-41, 56, 63, 64, 66, 70, 78-81).

6)  Defendants' Intent.

The intent of the Defendant in a trademark infringement case may stand alone in the overall analysis.  This is because "[i]f a mark is adopted with the intent of deriving benefit from the reputation of another mark, that fact alone may be sufficient to justify the inference that there is confusing similarity."[30] Thus, courts have generally found that the "Defendant's intent is a critical factor in determining whether there is a likelihood of confusion."[31]

Defendants engage in clear-cut copying here, giving rise to an inference that Defendants intended to benefit from Plaintiff's reputation to Plaintiff's detriment.[32]

7)  Evidence of Actual Confusion.

Of critical weight in the digit analysis is evidence of actual confusion. While "[a]ctual

---

[27] *Abraham v. Alpha Chi Omega*, 781 F. Supp. 2d 396, 422 (N.D. Tex. 2011).

[28] See *John H. Harland Co.,* 711 F.2d at 976.

[29] *Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1339–40 (11th Cir. 1999) citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1166 (11th Cir. 1982).

[30] *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 254 (5th Cir. 1980).

[31] *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props.*, 616 F. Supp. 2d 622, 629 (N.D. Tex. 2009).

[32] See *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 704 (5th Cir. 1981) (finding no plausible explanation for Defendant's copying of Plaintiff's trade dress other than Defendant's intent to benefit from Plaintiff's goodwill).

confusion need not be proven in a trademark infringement case," the strongest evidence is in cases where "consumers have confused the junior mark for the senior mark."[33] As a matter of evidentiary burden upon the parties, "while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof."[34]

A reasonable inference of actual confusion in the marketplace can be found based upon the circumstantial evidence that Defendants are advertising and selling goods identical in every way to Plaintiff's goods. (Decl. ¶¶ 8, 11, 25, 26, 32, 36, 38-41, 56, 59, 60, 63, 64, 66, 67, 70, 74-76, 78-81, 98, 99, Composite Ex. 1).

8)  Degree of Care Exercised by Potential Purchasers

The last factor assesses the degree of care exercised by potential purchasers in commerce. Generally, "the greater the care potential purchasers exercise, the less likely it is they will confuse a junior mark user's products or services with the senior mark user's products or services."[35]

Here, Defendants are advertising and selling mugs and drinkware identical to Plaintiff's goods, which easily dupes consumers into purchasing Defendants' Counterfeit Goods. (Owen Decl., Composite Ex. 1).

**b)      Likelihood of Success on False Designation of Origin Claim.**

Liability for false designation of origin, like trademark infringement, is also established here because the determining factor is whether the public is likely to be deceived or confused by the similarity of the marks at issue. See 15 U.S.C. § 1125(a); *Two Pesos*, 505 U.S. at 780. The

---

[33] *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 225 (5th Cir. 2009).
[34] *Id.*
[35] *Springboards to Educ.*, 912 F.3d at 817.

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

Plaintiff has established the merits of its trademark counterfeiting and infringement claims, therefore likelihood of success is also shown for Plaintiff's claim for false designation of origin.

### c) Likelihood of Success on Common Law Unfair Competition Claim.

Generally, the same evidence that supports an action for trademark infringement under the Lanham Act also supports an action for unfair competition.[36] Plaintiff has established the merits of its trademark infringement claims, therefore likelihood of success is also shown for Plaintiff's unfair competition claim.

### d) Likelihood of Success on Common Law Trademark Infringement Claim.

The same test applies to common law trademark infringement as to federal trademark infringement.[37] Plaintiff has satisfied the three elements of its trademark counterfeiting and infringement claims, therefore common law trademark infringement is also established.

### e) Likelihood of Success on Copyright Infringement Claim.

A copyright infringement action requires a Plaintiff to prove (1) ownership of a valid copyright, and (2) actionable copying by the Defendant. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

Plaintiff has established ownership of the copyright registered product photographs and website at issue in this action. (Owen Decl. ¶¶ 42-45). Plaintiff has also established Defendants' actionable copying by using those product photographs and the website content in Defendants' listings. (Owen Decl. ¶¶ 59, 60). Therefore, a likelihood of success on Plaintiff's copyright infringement claim is established.

---

[36] *Marathon Mfg. Co.*, 767 F.2d at 217.
[37] See *Liquid Manna, LLC v. GLN Glob. Light Network, LLC*, No. SA-14-CV-1123-DAE, 2016 WL 4385587, at *2 (W.D. Tex. Feb. 24, 2016), report and recommendation adopted, No. 5:14-CV-1123-DAE, 2016 WL 4385589 (W.D. Tex. Mar. 14, 2016).

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

f)       **Likelihood of Success on Patent Infringement.**

A patent is presumed valid. 35 U.S.C. § 282. Patent infringement is determined by

comparing the patent claims to the accused product. *Markman v. Westview Instruments, Inc.,* 52

F.3d 967, 976 (Fed. Cir. 1995) (*en banc*) *aff'd* 517 U.S. 370 (1996).

Likelihood of success on Plaintiff's patent infringement claim is shown here. Betty's Best

is the owner of all rights in and to the HOPGT Design Patent which claims the ornamental

design for a horse or pet grooming tool (Owen Decl. ¶¶ 48, 49). A comparison of the design

claimed in the HOPGT Design Patent to the Defendants' Goods shows that the Defendants'

Goods infringe the HOPGT Design Patent. (Owen Declaration ¶ 68, Composite Exhibit 1;

Complaint Exhibit 5). Therefore, a likelihood of success on Plaintiff's patent infringement claim

is shown.

2.       **Plaintiff is Suffering Irreparable Injury.**

A threat of irreparable injury is often found where a Plaintiff has lost control of the

quality of goods and services that are being associated with its mark.[38] Under the recently revised

Section 1125 of the Lanham Act however, "[a] Plaintiff seeking any ... injunction shall be

entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of

success on the merits . . . in the case of a motion for a preliminary injunction or a temporary

restraining order." 15 U.S.C. § 1116(a). A rebuttable presumption of irreparable injury is thus

warranted under the statute.[39]

---

[38] See *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008).

[39] See *Bisous Bisous LLC v. The Cle Grp.*, LLC, No. 3:21-CV-1614-B, 2021 WL 3618042, at *12 (N.D. Tex. Aug. 16, 2021); see also *A-76 Technologies, Inc.; dba Aidant Brands v. Mass Management, LLC.*, No. 4:21-CV-923, 2021 WL 6202654, at *2 (S.D. Tex. Sept. 7, 2021).

A likelihood of confusion exists herein because Defendants have engaged in counterfeiting activities using spurious designations similar or identical to one or more of the Betty's Best Marks, the copyrighted Works and the HOPGT Design Patent.

### 3.        The Balance of Hardship Tips Sharply in Plaintiff's Favor.

Plaintiff has expended substantial time, money, and other resources to develop the quality, reputation, and goodwill associated with the Betty's Best Marks. (Owen Decl. ¶¶ 27, 31-36). Defendants should not be permitted to continue their trade in counterfeit goods because Plaintiff will suffer substantial losses and damage to its reputation as a result. (Owen Decl. ¶ 97-99).

Meanwhile, Defendants will suffer no legitimate hardship in the event a Temporary Restraining Order is issued, because Defendants have no right to engage in their present counterfeiting and infringing activities.

### 4.        The Relief Sought Serves the Public Interest.

The public has an interest in not being misled as to the origin, source, or sponsorship of trademarked products. [40]

The public also has a strong interest in protecting the rights of a trademark holder.[41] Thus, the public interest is not disserved by an injunction prohibiting infringers from using infringing marks.[42]

---

[40] See *Best W. Int'l, Inc. v. R & Z Arastu Fam. Ltd. P'ship*, No. SA-07-CA-902-OG, 2007 WL 9710714, at *2 (W.D. Tex. Dec. 10, 2007) (noting that the unauthorized use of the Plaintiff's marks likely deceived the public and was thus a disservice to the public interest); see also *TGI Friday's Inc. v. Great NW. Restaurants, Inc.*, 652 F. Supp. 2d 763, 773 (N.D. Tex. 2009) (noting that the public had an interest in not being deceived into patronizing a restaurant that was using Plaintiff's marks without authorization).

[41] *Best W. Int'l, Inc.*, 2007 WL 9710714 at *2.

[42] See *Paulsson Geophysical Servs., Inc. v. Sigmar*, No. 1-06-CA-952-LY, 2007 WL 9702439, at *3 (W.D. Tex. Feb. 23, 2007), aff'd, 529 F.3d 303 (5th Cir. 2008) ("[A]n injunction preventing Defendants from using a mark that does not belong to them will not disserve the public interest."); *TGP Franchising, LLC v. Schooley Media Ventures, LLC*, No. CV SA-16-CA-546-FB, 2016 WL 10567692, at *5 (W.D. Tex. Dec. 6, 2016) (finding that Plaintiff was entitled to an injunction because "protecting Plaintiff's trademark from infringement [did] not disserve the public interest.").

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

Defendants are engaged in illegal activities which infringe upon Plaintiff's trademark, and directly defraud the consuming public by palming off Defendants' Goods as Plaintiff's genuine goods. The public interest favors the issuance of the requested relief to avoid further harm to the public as well as to the Plaintiff.

## C.    The Equitable Relief Sought is Appropriate.

The Lanham Act authorizes courts to issue injunctive relief "according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark …." 15 U.S.C. § 1116(a). The Copyright Act, 17 U.S.C § 502 (a), authorizes any Court having jurisdiction of a civil action arising under 17 U.S.C, subject to the provisions of section 1498 of 28 U.S.C, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright. The Patent Act authorizes the courts "having jurisdiction of cases under this title [35 USCS §§ 1 et seq.] to grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable" 35 U.S.C. § 283.

### 1.    Entry of an Order Immediately Enjoining Defendants' Unauthorized and Unlawful Use of Plaintiff's Trademarks, Copyrights and Design Patent is Appropriate.

Plaintiff requests an Order requiring Defendants immediately cease all use of the Betty's Best Marks, or substantially similar marks, the copyrigghted Works and the HOPGT Design Patent, including on or in connection with all e-commerce stores owned and operated, or controlled by them. This relief is necessary to stop the ongoing harm to Plaintiff's trademarks, copyrights, design patent, and goodwill and to prevent Defendants from continuing to benefit from the increased consumer traffic to their illegal operations created by their unlawful use of the Betty's Best intellectual property rights.

Many courts, including courts in this Circuit, have authorized immediate injunctive relief

in similar cases involving the unauthorized use of trademarks.[43]


## 2.    Entry of an Order Prohibiting Transfer of the Seller IDs During the Pendency of this Action is Appropriate.

To preserve the *status quo*, Plaintiff seeks an Order temporarily modifying control of and prohibiting Defendants from transferring use or control of the Seller IDs being used and controlled by Defendants to other parties.

Once they become aware of litigation against them, Defendants operating online can easily, and often will, change the ownership or modify e-commerce store data and content, change payment accounts, redirect consumer traffic to other seller identification names, and transfer assets and ownership of the Seller IDs, and thereby thwart the Court's ability to grant meaningful relief. (Rothman Decl. ¶¶ 14, 15).

Here, an interim order prohibiting Defendants from transferring their e-commerce stores operating under the Seller IDs poses no burden on them, preserves the *status quo*, and ensures that this Court, after fully hearing the merits of this action, will be able to afford Plaintiff full relief.[44]

---

[43] See *Grae v. Alamo City Motorplex, LLC*, No. 5:18-CV-664-DAE, 2018 WL 4169309, at *6 (W.D. Tex. July 2, 2018) (granting Plaintiff's Application for TRO); *Alamo Area Mut. Hous. Ass'n, Inc. v. Lazenby*, No. 5:17-CV-634-DAE, 2017 WL 7052289, at *6 (W.D. Tex. July 19, 2017) (granting in part Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction); *Brainstorm CC,* 2020 WL 8267578 at *8 (granting Plaintiff's *ex parte* Motion for a Temporary Restraining Order and Expedited Discovery); *Chanel, Inc.*, 2012 WL 3527147 at *2 (granting Plaintiff's *ex parte* Application for Entry of a Temporary Restraining Order); *Biotics Rsch. Corp. v. Biotics Rsch. of S. California, Inc.*, No. CV H-18-0352, 2018 WL 2323273, at *1 (S.D. Tex. Feb. 8, 2018) (same).
[44] See *Qin v. Partnerships & Unincorporated Associations on Schedule "A"*, No. 6:21-CV-1243-ADA, 2022 WL 80274, at *5 (W.D. Tex. Jan. 7, 2022) (order prohibiting the transfer of Defendant online marketplace accounts); *Chanel, Inc.*, 2012 WL 3527147 at *3 (order prohibiting Defendants from transferring away the domain names used to sell infringing products); *Brainstorm CC,* 2020 WL 8267578 at *7 (order requiring internet hosting services to shut down Defendant online stores); *adidas AG,* Case No. 21-60242 (order restraining the transfer of e-commerce stores operating via marketplace platforms).

**3.      An *Ex Parte* Order Restraining Transfer of Assets is Appropriate**

In addition to an Order temporarily restraining Defendants' practices, the Court should enter an order limiting the transfer of Defendants' unlawfully gained assets. Plaintiff has demonstrated above that it will likely succeed on the merits of its claims. As such, Plaintiff will be entitled to an accounting and payment of the profits earned by Defendants throughout the course of their counterfeiting scheme. 15 U.S.C. § 1117(a) (2018), 17 U.S.C. §§ 504 and 505, and 35 U.S.C. §§ 284 and 289.

The counterfeiting business is inherently deceptive. (Rothman Decl. ¶¶ 13-19). In view of Defendants' intentional violations, Plaintiff respectfully requests this Court grant additional *ex parte* relief identifying payment accounts and restraining the transfer of all monies held or received by the financial entities at issue herein for the benefit of any one or more of the Defendants.[45] This Court has broad authority to grant such an order. The Supreme Court has provided that district courts have the power to grant preliminary injunctions to prevent a Defendant from transferring assets in cases where an equitable interest is claimed.[46] Moreover, almost every Circuit has interpreted Fed. R. Civ. P. Rule 65 to grant authority to courts to restrain assets *pendente lite,*[47] and the Fifth Circuit has done so in these precise circumstances.[48]

In light of the illicit nature of the counterfeiting business and the ability of foreign

---

[45] See *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007) (affirming the district court's authority to enter an asset freeze and require an accounting of lost profits as part of Plaintiffs' equitable relief); *Qin*, 2022 WL 80274 at *6 (ordering the restraint of Defendants' assets because the fact the Defendants were foreign entities with no presence in the United States made collecting a monetary judgment unlikely).

[46] *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999).

[47] See *Mason Tenders Dist. Council Pension Fund v. Messera,* 1997 WL 223077 (S.D.N.Y. May 7, 1997) (acknowledging that "[a]lmost all the Circuit Courts have held that Rule 65 is available to freeze assets pendente lite under some set of circumstances").

[48] In *Animale Grp.*, the Fifth Circuit upheld an order granting an asset restraint against an alleged counterfeiter where the complaint included a request for a permanent injunction and the equitable remedy of an accounting of the alleged counterfeiter's profits under 15 U.S.C. § 1117. The Court emphasized the authority of the district court to enter the restraint, holding that a request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including a limited asset freeze, in order preserve the status quo. *Animale Grp.*, 256 F. App'x at 709.

counterfeiters to practically eliminate their evidentiary trails by conducting their business entirely over the internet, courts have ordered asset restraints in cases involving counterfeiting Defendants.[49]

Broad asset restraints preserve the availability of permanent relief, including assets that are not directly traceable to the fraudulent activity.[50] In cases substantially similar to this matter, other district courts have entered the precise relief sought herein.[51] Using the power to issue provisional remedies ancillary to their authority to provide final equitable relief, numerous courts have granted orders restraining Defendants from transferring their assets under trademark infringement claims.[52]

Moreover, to provide complete equitable relief, courts have granted such orders without providing notice to the Defendants. Specifically, federal courts have held that where advance notice of an asset restraint is likely to cause a party to alienate the assets sought to be restrained, a temporary restraining order may be issued ex parte.[53] In this case, Defendants' blatant

---

[49] See *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd*, 970 F.2d 552 (9th Cir. 1992); *ABG EPE IP, LLC v. 15205060710*, No. 1:21-CV-0618, 2021 WL 2890780, at *4 (N.D. Ga. Feb. 12, 2021).

[50] See *Kemp v. Peterson*, 940 F.2d 110, 113-14 (4th Cir. 1991) (district court may restrain assets not specifically traced to illegal activity); *S.E.C. v. Lauer*, 445 F. Supp. 2d 1362, 1370 (S.D. Fla. 2006) (there is no requirement for the restrained assets be traceable to the fraudulent activity underlying a lawsuit); *Levi Strauss & Co.*, 51 F.3d at 987-88 (upholding asset restraint, including assets not linked to the profits of the alleged illegal activity, noting the Defendants may request the court exempt any particular assets).

[51] See e.g., *WHAM-O Holding, Ltd. v. Partnerships & Unincorporated Associations Identified on Schedule "A"*, No. 1:21-CV-01885, 2021 WL 2627458 (N.D. Ill. May 4, 2021) (order converting TRO to a preliminary injunction, requiring financial institutions to identify Defendants' payment accounts and to restrain the funds in those accounts); *Volkswagen AG v. Unidentified Associations Identified in Schedule A*, No. 1:17-CV-1413, 2018 WL 3653365 (E.D. Va. Jan. 5, 2018) (same); *Spy Optic Inc. v. Individuals, Partnerships & Unincorporated Associations Identified on Schedule A*, No. CV 17-7649 DSF (KSX), 2017 WL 10592133 (C.D. Cal. Nov. 27, 2017) (same); *Taylor Made Golf Company, Inc. v. Individuals, P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, Case No. 20-cv-60468-RS (S.D. Fla. April 9, 2020) (order granting TRO, requiring financial institutions to identify Defendants' payment accounts and to restrain the funds in those accounts to preserve assets to satisfy Plaintiffs' requested relief); *Whirlpool Corporation v. Discountfridgefilter.com*, Case No. 19-cv-63115-RS (S.D. Fla. Jan. 7, 2020) (same).

[52] See e.g., *Levi Strauss & Co.*, 51 F.3d at 987; *Reebok Int'l Ltd.*, 970 F.2d at 559.

[53] See *F.T. Int'l Ltd v. Mason*, No. CIV.A. 00-5004, 2000 WL 1514881, at *3 (E.D. Pa. Oct. 11, 2000) (granting *ex parte* TRO restraining Defendants' bank accounts upon finding that advance notice would likely have caused the Defendants to secret or alienate funds); *CSC Holdings, Inc. v. Greenleaf Elec., Inc.*, 2000 WL 715601 (N.D. Ill. 2000) (converting *ex parte* TRO into preliminary injunction enjoining cable television pirates and restraining

violations of federal trademark, copyrights and patent laws warrant an *ex parte* order restraining the transfer of their ill-gotten assets. Moreover, as Defendants' businesses are conducted anonymously over the Internet, Plaintiff has additional cause for *ex parte* relief, as Defendants may easily secret or transfer their assets without the Court's or Plaintiff's knowledge.

**4.    Entry of an Order Requiring Facebook (and its parent company Meta) to prevent further abuse of Plaintiff's Trademarks, Copyrights and Design Patent is Appropriate.**

In this case, the Court should enter the Order including Facebook (and its parent company Meta), temporarily restraining Defendants' practices; requiring Facebook to abide by U.S. law and its own Brand Rights Protection policy, prevent further abuse of the Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent. Plaintiff's efforts pursuing the IP infringements within the Facebook Ads Library pursuant Facebook's Brand Rights Protection policy hasn't been effective to stop permanently Counterfeiters' misappropriation and exploitation of Plaintiff's intellectual property rights. Defendants' blatant violations of federal trademark, copyrights and patent laws, in addition to the passive behavior of Facebook regarding the IP ingringements reported, warrant an *ex parte* Order requiring Facebook (and its parent company Meta) provides the complete contact information including email addresses, links and/or any other data serving as identifiers, associated with each Facebook Ad Library ID number assigned to each Add created, using counterfeitings and infringements of the Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent; as well requiring Facebook (and its parent company Meta) removes Facebook Ads using the Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent to promote the sale of counterfeit Betty's Best products.

---

pirates' assets).

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

**D.      A Bond Should Secure the Injunction.**

Because of the strong and unequivocal nature of Plaintiff's evidence of counterfeiting and infringement, Plaintiff respectfully requests this Court require it to post a bond of no more than ten thousand dollars ($10,000.00), subject to increase at the Court's discretion should an application be made in the interest of justice. The posting of security upon issuance of a temporary or preliminary injunction is vested in the Court's sound discretion. Fed. R. Civ. P. 65(c).

## IV.      CONCLUSION

In view of the foregoing, Plaintiff respectfully requests this Court grant its *Ex Parte* Application and enter a Temporary Restraining Order as to Defendants in the form submitted herewith and schedule a hearing on Plaintiff's Motion for a Preliminary Injunction before the expiration of the Temporary Restraining Order.

Additionally, in the event the Application is granted, Plaintiff respectfully requests the Court permit the parties, including witnesses, to appear and testify as necessary telephonically or by remote video at the hearing on Plaintiff's Motion for a Preliminary Injunction, in accordance with the administrative orders of this Court.

Furthermore, due to the time provisions of a Temporary Restraining Order, in the event the Application is granted, Plaintiff respectfully requests the Court provide a copy of the Temporary Restraining Order to Plaintiff's counsel via e-mail at docket@sriplaw.com so that Plaintiff may immediately effectuate any relief ordered therein and provide Defendants' proper notice of the Order and any subsequent hearing date.

DATED: October 28, 2022                    Respectfully submitted,

*/s/ Joel B. Rothman*

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

JOEL B. ROTHMAN
joel.rothman@sriplaw.com
CRAIG A. WIRTH
craig.wirth@sriplaw.com
LAYLA T. NGUYEN
layla.nguyen@sriplaw.com

**SRIPLAW, P.A.**
21301 Powerline Road
Suite 100
Boca Raton, FL  33433
561.404.4350 – Telephone
561.404.4353 – Facsimile

and

ELIEZER LEKHT
eliezer.lekht@sriplaw.com

**SRIPLAW, P.A.**
175 Pearl Street
Third Floor
Brooklyn, NY 11201
332.600.5599 – Telephone
561.404.4353 – Facsimile

*Counsel for Plaintiff Betty's Best, Inc.*